# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SWEDISH AMERICAN HOSPITAL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 08-2046 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: | 28, 32 |
| | : | | |
| KATHLEEN SEBELIUS, | : | | |
| Secretary of the Department of | : | | |
| Health and Human Services, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment. In September 2008, the Department of Health and Human Services ("HHS") issued an administrative ruling that required the plaintiff, a hospital in Rockford, Illinois, to repay several million dollars to the Medicare program for the training of its medical residents. The plaintiff commenced this action challenging the ruling under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., arguing that the defendant should be estopped from demanding reimbursement. For the following reasons, the court grants in part and denies in part the parties' respective motions, and remands the matter to the administrative agency for further proceedings regarding the plaintiff's alleged entitlement to relief under 42 C.F.R. § 412.86(g)(8).

## II.  BACKGROUND

### A.  Legal Framework

#### 1.  Medicare Reimbursement of Medical Education Costs

Medicare provides health insurance to the elderly and disabled by entitling eligible beneficiaries to have payment made on their behalf for the care and services rendered by health care providers.  *See* 42 U.S.C. §§ 1395 *et seq.*  Providers, in turn, are reimbursed by insurance companies, known as "fiscal intermediaries," that have contracted with the DHS to aid in administering the Medicare program.  *See id.* § 1395h.  Fiscal intermediaries determine the amount of reimbursement due to providers under the Medicare Act and applicable regulations. *See id.*

Providers that train residents in approved residency programs may be reimbursed for the costs of "graduate medical education" ("GME") and "indirect medical education" ("IME").  *See* 42 U.S.C. § 1395ww.  One variable used to calculate the reimbursable GME and IME costs allocable to a provider is the number of full-time equivalent ("FTE") residents in that provider's training program.  *See id.*  A high GME or IME FTE resident count yields a correspondingly high GME or IME payment for the provider.  *See id.*

To receive reimbursement for these services rendered to Medicare beneficiaries, a provider must submit a yearly "cost report" to its fiscal intermediary, in which it demonstrates the costs incurred during the previous fiscal year and the portion of those costs allocable to Medicare.  *See* 42 C.F.R. § 413.20.  The fiscal intermediary may audit the cost report before determining the total amount of reimbursement to which the hospital is entitled, which is then memorialized in a Notice of Program Reimbursement ("NPR").  *See id.* § 405.1803.  The fiscal intermediary may reopen and revise a cost report within three years after the date of the NPR.

*Id.* § 405.1885.

## 2. The FTE Resident Cap

In the Balanced Budget Act of 1997 ("BBA"), Congress capped the number of residents that a hospital may count for purposes of calculating the IME adjustment and GME payments. 42 U.S.C. §§ 139ww(d)(5)(B). More specifically, for cost reporting periods beginning on or after October 1, 1997, the BBA limited the number of GME FTEs and IME FTEs that a hospital could count for the purpose of calculating GME and IME payments to the FTEs in "the hospital's most recent cost reporting period ending on or before December 31, 1996" ("FTE resident cap"). *Id.*

As evidenced by the BBA's legislative history, Congress was concerned with how best to design and calculate the FTE resident cap. H.R. Conf. Rep. No. 105-217, at 821-22 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 176, 441-42. Recognizing the complexity of the issues raised, Congress chose to delegate to the defendant the task of implementing rules to govern the FTE resident cap. *Id.* In delegating this rule-making authority, Congress noted that the defendant should "give special consideration to facilities that meet the needs of underserved rural areas." *Id.* Similarly, Congress instructed the defendant to apply the "proper flexibility to respond to [the] changing needs" of training programs; such flexibility, however, would necessarily be "limited by the conference agreement that the aggregate number of FTE residents should not increase over current levels." *Id.*

The defendant promulgated regulations implementing the FTE resident cap in 1997. *See* 42 C.F.R. §§ 413.86(g)(4), 412.105(f)(1)(iv) (1997) ("1997 Final Rule"). The defendant subsequently revised the regulations concerning the GME and IME resident caps in 1998, 1999 and 2001. *See* 42 C.F.R. §§ 413.86, 412.105 (1998) ("1998 Final Rule"); 42 C.F.R. §§

413.86(g)(8) (1999) ("the 1999 Final Rule"); 42 C.F.R. §§ 413.86(g)(8)(iii), 412.105(f)(1)(ix) (2001) ("the 2001 Final Rule"). Through these regulations, the defendant carved out exceptions to the FTE resident cap, two of which are relevant here: (1) the Affiliated Group Exception and (2) the Temporary Cap Increase Exception.

### 3. Affiliated Group Exception

In 1997, the defendant issued a regulation stating that "[h]ospitals that are part of the same affiliated group may elect to apply the limit on an aggregate basis" ("the Affiliated Group Exception"). 42 C.F.R § 413.86(g)(4) (1997) ("1997 Final Rule"). Initially, the defendant narrowly defined an "affiliated group" as "two or more hospitals located in the same geographic wage area . . . in which individual residents work at each of the hospitals seeking to be treated as an affiliated group during the course of the approved program." *Id*. The regulation did not address whether a written agreement was necessary to demonstrate the existence of an affiliated group. *See generally id.*

In 1998, the defendant issued revised regulations which provided further guidance regarding the requirements to qualify under the Affiliated Group Exception. *See* 42 C.F.R. § 413.86(b)(2). More specifically, the 1998 Final Rule expanded the definition of affiliated group to include providers in contiguous areas that were under common ownership. *Id*. Additionally, the preamble to the 1998 Final Rule clarified the documentation needed to demonstrate the existence of an affiliated group for cap sharing purposes, stating that

> [h]ospitals that qualify to be members of the same affiliated group for the current residency training year and elect an aggregate cap must provide an agreement to the fiscal intermediary and the HCFA specifying the planned changes to individual hospital count under an aggregate FTE cap by July 1 for . . . the residency training year. Each agreement must be for a minimum of one year and may specify the adjustment to each respective hospital cap under an aggregate cap in the event the agreement terminates, [or] dissolves. . . . [Further] [e]ach

> agreement must specify that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount.

63 Fed. Reg. 26318, 26341 (May 12, 1998); *see also* 42 C.F.R. 413.86(g)(7)(ii) (2002) (incorporating the language used in the preamble of the 1998 Final Rule into the text of the 2002 Final Rule). Additionally, the defendant stated that "[h]ospitals that no longer have a relationship for training residents do not meet the criteria for being members of the same affiliated group even if those hospitals jointly participated in residency training in the past." 63 Fed. Reg. at 26341.

### 2. The Temporary Cap Increase Exception

The second relevant regulatory exception to the FTE resident cap applies in circumstances in which a hospital closes or discontinues its resident training program ("Temporary Cap Increase Exception"). Unlike the Affiliated Group Exception, the Temporary Cap Increase Exception was not articulated in the original 1997 Final Rule, but was, instead, first addressed in the preamble to the 1998 Final Rule. *See* 63 Fed. Reg. at 26330. The relevant passage states that a temporary adjustment to the FTE resident cap may be appropriate "[w]hen a hospital takes on residents because another hospital closes or discontinues its program." *Id.* The rule is grounded in the notion that "[i]n these situations, residents may have partially completed a medical residency training program and would be unable to complete their training without a residency position at another hospital." *Id.* Somewhat inconsistently, however, the defendant appears in the same preamble to limit the Temporary Cap Increase Exception solely to hospital closures, stating that the agency

> believe[s] that it is appropriate to allow temporary adjustments to the FTE caps for a hospital that provides residency positions to medical residents who have partially completed a residency training program at a hospital which closed. For

5

purposes of this final rule, we will allow for temporary adjustments to a hospital's FTE cap to reflect residents affected by a hospital closure.

*Id.*

The defendant did not include language addressing the Temporary Cap Increase Exception in the text of the 1998 Final Rule. *See generally* 42 C.F.R. §§ 413.86, 412.105 (1998). In 1999, however, the defendant revised the regulations so as to allow a temporary adjustment to the FTE resident cap following a hospital's closure. *See* 42 C.F.R. § 413.86(g)(8) (1999). The preamble to the 1999 Final Rule further articulated that the Temporary Cap Increase Exception does not apply to circumstances "other than hospital closures because, unless the hospital actually terminates its Medicare agreement, it will retain its statutory FTE cap" and "can still decide to train residents at the hospital or affiliate with other hospitals for purposes of establishing an aggregate cap." 64 Fed. Reg. 41490, 41522-23 (July 30, 1999).

In 2001, the defendant expanded the Temporary Cap Increase Exception to cover circumstances in which a hospital assumes the training of additional residents because of another hospital's termination of its residency program. *See* 42 C.F.R. §§ 413.86(g)(8), 412.105(f)(1)(ix) (2001); 66 Fed. Reg. 39828, 39899 (Aug. 1, 2001). Notably, this amendment only applied to cost reporting periods and discharges beginning on or after October 1, 2001. 66 Fed. Reg. at 39899.

### B. Factual & Procedural History

The plaintiff is a teaching hospital and Medicare provider located in Rockford, Illinois. Compl. ¶¶ 1, 11. It trains residents to become family practice physicians through its participation in the Family Practice Residency Program ("the residency program"), a program sponsored by the University of Illinois College of Medicine. *Id.* ¶¶ 12-14.

During fiscal years 1995 and 1996, another hospital, St. Anthony Medical Center ("St. Anthony"), also participated in the residency program. *Id.* ¶¶ 17-18. In 1996, St. Anthony withdrew from the program and the plaintiff absorbed the residents that St. Anthony would otherwise have trained. *Id.*

After the plaintiff took on the residents who had been training at St. Anthony, the plaintiff contacted the fiscal intermediary, Mutual of Omaha ("Mutual"), which advised the plaintiff to adjust its GME and IME FTE resident caps upward to reflect the fact that the plaintiff had assumed the former St. Anthony residents. *Id.* ¶¶ 18-19. As a result, the plaintiff's NPRs for fiscal years 1998 through 2002 were based on FTE resident caps that reflected both the residents trained by the plaintiff and the residents previously trained at St. Anthony. *Id.* ¶ 20.

In February 2005, Mutual reopened the cost reports for fiscal years 1999 through 2002[1] and adjusted the plaintiff's FTE resident caps downward to omit consideration of the residents who had previously trained at St. Anthony. *Id.* ¶¶ 21-22. Likewise, Mutual omitted consideration of St. Anthony's residents in the NPR that it issued for fiscal year 2003. *Id.* ¶ 23. After the plaintiff appealed Mutual's determination, the Provider Reimbursement Review Board ("PRRB") issued a ruling affirming Mutual's adjustments on September 30, 2008. *Id.* ¶ 25. This determination resulted in Medicare recouping nearly $5 million from the plaintiff. *Id.*

---

[1]    Because the NPR for fiscal year 1998 was issued in February 2000, *see* Compl. ¶ 37, the three-year limitation period for reopening a cost report had elapsed by the time Mutual issued the Notices of Reopening in February 2005, *see id.* ¶ 21.

The plaintiff commenced this action in November 2008, alleging that the agency's decision violated the APA.[2]  *Id.* ¶¶ 66-87.  In March 2010, the court declined to dismiss the claims against the defendant.  *See* Mem. Op. (Mar. 5, 2010) at 15.  The parties have now filed cross-motions for summary judgment.  With the motions ripe for adjudication, the court turns to the applicable legal standards and the parties' arguments.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

---

[2]    The plaintiff also asserted tort claims against Mutual and its successor-in-interest, but the court dismissed these claims for lack of jurisdiction in an earlier ruling.  *See* Mem. Op. (Mar. 5, 2010) at 11-12.

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

## B. Legal Standard for APA Review of the PRRB's Decision

Pursuant to the Medicare statute, the court reviews PRRB decisions in accordance with standard of review set forth in the APA. 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Mem'l Hosp./Adair Cnty Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 116 (D.C. Cir. 1987). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). The "arbitrary and capricious"

standard and the "substantial evidence" standard "require equivalent levels of scrutiny."[3] *Adair Cnty*, 829 F.2d at 117. Under both standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not disturb the agency's action. *Md. Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998). The burden of showing that the agency action violates the APA standards falls on the provider. *Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979); *St. Joseph's Hosp. (Marshfield, Wis.) v. Bowen*, 1988 WL 235541, at *3 (D.D.C. Apr. 15, 1988).

In reviewing an agency's interpretation of its regulations, the court must afford the agency substantial deference, giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation."[4] *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotations omitted); *Presbyterian Med. Ctr. of Univ. of Pa. Health Sys. v. Shalala*, 170 F.3d 1146, 1150 (D.C. Cir. 1999); *see also Qwest Corp. v. Fed. Commc'ns Comm'n*, 252 F.3d 462, 467 (D.C. Cir. 2001) (stating that the court would reverse an agency's reading of its

---

[3]     This Circuit has explained that the substantial evidence standard is a subset of the arbitrary and capricious standard. *Sithe/Indep. Power Partners v. Fed. Energy Regulatory Comm'n*, 285 F.3d 1, 5 n.2 (D.C. Cir. 2002). "While the substantial evidence test concerns support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent." *Mem'l Hosp./Adair Cnty Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987).

[4]     "[A court's] review in such cases is 'more deferential . . . than that afforded under *Chevron*.'" *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) (quoting *Nat'l Med. Enters. Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995)).

regulations only in cases of a clear misinterpretation). "So long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect." *Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999). Where the regulations involve a complex, highly technical regulatory program such as Medicare, broad deference is "all the more warranted." *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotations omitted); *Presbyterian Med. Ctr.*, 170 F.3d at 1151. As for interpretive guides, they are without the force of law but nonetheless are entitled to some weight. *Furlong v. Halala*, 156 F.3d 384, 393 (2d Cir. 1998).

### C. The Court Grants in Part and Denies in Part the Defendant's Motion for Summary Judgment & Grants in Part and Denies in Part the Plaintiff's Motion for Summary Judgment

In its motion, the plaintiff argues that (1) the government should be "estopped from denying reimbursement to [the plaintiff]," (2) "the PRRB decision is inconsistent with Congressional intent" and (3) "the PRRB decision and [the defendant's] actions were arbitrary and capricious." Pl.'s Mot. at 23. The defendant responds that, as a matter of law, a claim of estoppel against the government is not viable where a Medicare provider has relied on the erroneous advice of a fiscal intermediary. Def.'s Cross-Mot. at 2. The defendant further contends that its refusal to increase the plaintiff's resident caps was reasonable "given the clear language of the [BBA] and the lack of any applicable regulatory exception." *Id*. The court addresses each of these arguments below.

### 1. The Defendant Cannot Be Estopped From Recovering Medicare Funds Provided to the Plaintiff Based on Erroneous Advice Provided By the Fiscal Intermediary

The plaintiff first argues that the defendant should be estopped from seeking reimbursement of Medicare funds disbursed to the plaintiff because the plaintiff reasonably and detrimentally relied on erroneous advice it had received from Mutual. Pl.'s Mot. at 23. Because

this advice was "so closely connected to the basic fairness of the administrative decision[-]making process," the plaintiff argues, the defendant "should be estopped from disavowing the misstatement." *Id*. The plaintiff further asserts that estoppel is especially appropriate here because the defendant has been unjustly enriched by receiving the benefits of having additional residents educated by the plaintiff. *Id.* at 29-30. In response, the defendant argues that Supreme Court precedent precludes the plaintiff from demonstrating reasonable reliance based on reimbursement-related advice and the conduct of a Medicare fiscal intermediary.[5] Def.'s Cross-Mot. at 35.

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty Health Servs.*, 467 U.S. 51, 59 (1984). A party attempting to apply equitable estoppel against the government must show, *inter alia*, that "the party relied on its adversary's conduct in such a manner as to change his position for the worse [and that] the party's reliance was reasonable." *Keating v. Fed. Energy Regulatory Comm'n*, 569 F.3d 427, 434 (D.C. Cir. 2009) (internal citations omitted). Reasonable reliance means that "the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Cmty Health Servs.*, 467 U.S. at 59.

"The fundamental principle of equitable estoppel applies to government agencies, as well as private parties." *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990) (declining to accept the government's "argument for an across-the-board no-estoppel rule"). It is clear, however, that the

---

[5]     The defendant argues, in the alternative, that the record shows "that any advice [the plaintiff] received from Mutual was not final or concrete, and it was not reasonable for [the plaintiff] to rely upon it." Def.'s Cross-Mot. at 39. The court does not reach this argument because, as discussed below, the plaintiff's reliance on advice by a fiscal intermediary was unreasonable. *See Heckler v. Cmty Health Servs.*, 467 U.S. 51, 60 (1984).

doctrine's "application to the government must be rigid and sparing." *ATC Petroleum Inc.*, 860 F.2d at 1111; *see also Int'l Union v. Clark*, 2006 WL 2590846, at *12 (D.D.C. Sept. 11, 2006) (observing that "[t]here is a clear presumption in this Circuit against invoking the [estoppel] doctrine against government actors in any but the most extreme circumstances"), as not "a single case [before the Supreme Court] has upheld an estoppel claim against the Government for the payment of money," *Richmond*, 496 U.S. at 426; *see also ATC Petroleum Inc.*, 860 F.2d at 1111 (noting that the Circuit has also not applied estoppel to require payment from the government).

In determining whether the plaintiff's reliance on Mutual's advice was reasonable, the Supreme Court's decision in *Heckler v. Community Health Services*, 467 U.S. 51 (1984), is particularly instructive. In *Community Health Services*, the respondent, a Medicare provider, invoked estoppel after it had relied on erroneous information provided by a fiscal intermediary. *Cmty Health Servs.*, 467 U.S. at 59. The Supreme Court held that, as a participant in the Medicare program, the respondent had "a duty to familiarize itself with the legal requirements for cost reimbursement." *Id.* at 64. This obligation included acquainting itself "with the nature of and limitations on the role of a fiscal intermediary." *Id.* The Supreme Court explained that

> [t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of [substantial] sums of money.

*Id.* The Court held that "[a]s a recipient of public funds well acquainted with the role of a fiscal intermediary, [the Medicare provider] knew [that the fiscal intermediary] only acted as a conduit; it could not resolve policy questions." *Id.* at 64-65. Thus, the Court concluded that a Medicare participant's reliance on a fiscal intermediary's erroneous advice was "insufficient to raise []

estoppel" against the government because the advice should not have "induced [the participant's] reliance" in the first place. *Id.*

Here, as in *Community Health Services*, when questions arose concerning the plaintiff's FTE resident count, the plaintiff "made no attempt to have the question resolved by the Secretary" or any other legal authority and was instead "satisfied with the policy judgment" of the fiscal intermediary, a "mere conduit." *Id.* at 64. Because the plaintiff's reliance on Mutual was unreasonable, *id.*; *see also Bradley Mem. Hosp. v. Leavitt*, 599 F. Supp. 2d 6, 15 (D.D.C. 2009) (holding that the plaintiffs' decision "to rely on statements made by the [fiscal] intermediary's employees cannot now be blamed on the Secretary"); *Monongahela Valley Hosp., Inc. v. Sullivan*, 945 F.2d 576, 589 (3d Cir. 1991) ("Because a fiscal intermediary can neither definitively interpret regulations nor make policy pronouncements, [the Medicare provider's] contention that it reasonably relied on [a fiscal intermediary's] representation . . . misapprehends the nature of the relationship between the [f]iscal [i]ntermediary and the Secretary."), the defendant cannot be estopped from demanding reimbursement for the costs of training residents in excess of its allotted FTE residents under the BBA based on the erroneous advice provided by Mutual.

### 2. The PRRB's Decision Does Not Contravene Congress's Intent

The plaintiff argues that the PRRB's decision must be set aside as inconsistent with the Congressional intent underlying the BBA. Pl.'s Mot. at 30-31. The plaintiff contends that by enacting the BBA Congress intended to maintain the status quo with respect to the number of resident training positions available on a national level – what the plaintiff refers to as a "national cap." *Id.* at 30-31. Therefore, the plaintiff suggests that it could use St. Anthony's FTE resident counts as long as it would not adjust the national cap figure. *See id.* The plaintiff acknowledges

that Congress also intended to institute a "facility cap," which would limit the individual medical provider's FTE resident count. *Id.* Nevertheless, the plaintiff suggests that this facility cap was intended to be shared by the facilities in a common area, so that those FTE resident positions that were not utilized by one-area hospital could be used by another hospital. *See id.* In support of this theory, the plaintiff asserts that the BBA "allows [the defendant] to make adjustments to the number of FTEs at each hospital as long as the aggregate number of FTEs in the area remains capped." *Id.* at 31. The plaintiff further contends that Congress intended that the defendant be "flexible" in administrating the FTE resident cap "so that the Medicare program could respond to changing needs," such as "hospitals initiating and terminating teaching programs." *Id.* The plaintiff concludes that the PRRB's decision is inconsistent with Congressional intent because it fails "to follow the Congressional mandate to be flexible and refusing to recognize the national cap." *Id.*

The defendant, in turn, contends that Congress's objective in enacting the BBA was not to impose a "national cap," which would maintain Medicare costs at the status quo, but rather that Congress sought to reduce costs by decreasing the number of resident slots paid for through Medicare. Def.'s Cross-Mot. at 30. The defendant further argues that even if Congress intended to impose a national cap, the text of the BBA clearly imposes a facility-level cap as well. *Id.* Although the defendant acknowledges that Congress required it to be flexible when "applying the cap limit to new, not already-established programs" and to promulgate regulations to address the implementation of the provision of the BBA at issue, the defendant argues that Congress did not require it to "promulgate regulations or exercise flexibility in the way that the plaintiff desires." *Id.* at 31.

"Where . . . an agency is applying a statute entrusted by Congress to its administration,"

the court employs the familiar *Chevron* analysis. *Nat'l Med. Enter. Inc. v. Shalala*, 43 F.3d 691, 695 (D.C. Cir. 1995); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The court first determines "whether Congress has spoken to the precise question at issue" by looking at either the statutory language or its legislative history. *Chevron,* 467 U.S. at 842. However, "[i]f the language is plain on its face, courts do not ordinarily resort to legislative history." *Saadeh v. Farouki*, 107 F.3d 52, 57 (D.C. Cir. 1997). If Congress has made its intent unambiguous, either through statutory language or legislative history, the court ends its inquiry. *See Chevron*, 467 at 858-64. Otherwise, the court must defer to the agency's position, so long as it is reasonable. *Id.* at 843; *Sea-Land Servs., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (holding that "[*Chevron*] deference comes into play of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency").

The BBA's statutory language clearly limits a teaching hospital's GME FTEs and IME FTEs to the number reported on "the hospital's most recent reporting period ending on or before December 31, 1996." 42 U.S.C. §§ 139ww(d)(5)(B). Thus, the statutory language expresses Congress's intent to impose a facility-level cap as well as Congress's intent that the FTE resident count be limited to the figure reported in the "reporting period ending on or before December 31, 1996." *Id.* The plaintiff fails to offer any alternative interpretation of the statutory language, instead focusing exclusively on the BBA's legislative history. *See Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 241 (D.C. Cir. 1981) ("It is axiomatic that in interpreting any statutory provision our starting point must be the language of the statute itself." (quoting *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980))).

At any rate, the relevant legislative history does not demonstrate that Congress intended

to allow a teaching hospital to absorb the FTE resident credits from a second hospital solely because the second hospital chose to terminate its participation in a jointly-taught residency program. *See* H.R. Conf. Rep., at 821-22 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 176, 442-43. Although Congress clearly wanted the defendant to utilize flexibility when promulgating rules governing the FTE resident cap, it expressly stated that such flexibility was to be "limited by the [Senate and House] conference agreement that the aggregate number of FTE residents should not increase over current levels." *See id.* Moreover, the legislative history confirms that Congress recognized the "complex issues" that would result from instituting the FTE resident cap and specifically authorized the defendant to promulgate regulations to address these issues. *Id.*; *see also Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991) ("When Congress, through express delegation . . . has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited."). Given Congress's delegation of authority to the defendant and the absence of any compelling evidence in the legislative record indicating that Congress intended to interpret the BBA in the fashion propounded by the plaintiff, the court must defer to the agency's position so long as it is reasonable. *See Chevron*, 467 U.S. at 842; *Sea-Land Servs., Inc.*, 137 F.3d at 645. Accordingly, the court turns to consider whether the PRRB's decision was reasonable.

### 3. Although the PRRB Reasonably Decided That the Affiliated Group Exception Did Not Apply, It Was Arbitrary Not to Address Whether the Temporary Cap Exception Applied

The plaintiff argues that the PRRB acted arbitrarily by failing to consider various "relevant factors" in demanding reimbursement under the FTE resident cap. Pl.'s Mot. at 32. For instance, the plaintiff argues that in determining whether St. Anthony's FTE resident slots should have been counted toward the plaintiff's FTE resident count, the PRRB should have

considered the fact that St. Anthony had not used any of its FTE resident slots since September 30, 1996 and that it would likely not do so in the future due to the length of time that it would take to establish an accredited resident training program. *Id.* at 32-34. Additionally, the plaintiff argues that a written affiliation agreement between itself and St. Anthony was not necessary to transfer St. Antony's FTE resident slots because St. Anthony and the plaintiff had been joint sponsors of the Family Practice Program since 1971 and were actively negotiating a merger in 1996 and 1997. Pl.'s Reply at 14-15. Thus, the plaintiff asserts that the defendant erred by not making "an exception" to the requirement for a written affiliation agreement because in the event that St. Anthony had "stayed in the [Family Practice Program], or even merely withdrawn after the passage of the BBA, [the plaintiff and St. Anthony] could have made other arrangements in order to aggregate the resident caps which had not been in place when [St. Anthony] withdrew." *Id.* at 15.

The plaintiff also contends that the PRRB "failed to set forth adequate reasons for denying [the plaintiff's] upward adjustment [to] the FTE Resident Caps," Pl.'s Mot. at 39, and instead "summarily concluded that [the plaintiff] [did] not meet any of the various requirements of the Medicare regulations that would have allowed it to include St. Anthony's [FTE slots] and count [them] in its resident count," *id*. at 35. More specifically, the plaintiff argues that the preamble to the 1998 Final Rule suggests that the defendant was of the position that an "upward adjustment of a hospital's FTE Resident Caps would be appropriate in instances in which the hospital assumed additional residents . . . because [] another hospital closed or discontinued its teaching program." *Id*. at 39. The plaintiff submits that the PRRB's failure to provide any "reasoned analysis" for the defendant's "sudden change" in position from the preamble statement in the 1998 Final Rule is arbitrary and capricious. *Id*.

The defendant argues that the plain language of the BBA required the plaintiff to cap its residents at the number of FTE residents included on the plaintiff's most recent cost reporting period ending on or before December 31, 1996. Def.'s Cross-Mot. at 20. The defendant contends that the plaintiff has not complied with the regulatory requirements for an Affiliated Group Exception because it has neither shown that it was *jointly* participating in the training of interns and residents with St. Anthony nor advanced any formal agreement between St. Anthony and the plaintiff specifying the planned cap changes. *Id*. at 21-23. Additionally, the defendant argues that the Temporary Cap Increase Exception would not have allowed the plaintiff to combine St. Anthony's allotted FTE residents with its own because it was not until October 1, 2001 that the defendant provided a temporary cap increase to hospitals that absorbed residents from another hospital's discontinued residency programs. *Id.* at 25-26. The defendant asserts that although the Temporary Cap Increase Exception was in effect prior to 2001, it applied solely to hospital closures. *Id.* at 26. Although the defendant acknowledges that the preamble to the 1998 Final Rule expressly states that "a temporary adjustment to the cap is appropriate and consistent" when a hospital absorbs residents due to a program discontinuance, it argues that aside from this "somewhat loose[ly] draft[ed]" sentence, the 1998 Final Rule is clear in providing a temporary cap increase solely in situations where a hospital closed. *Id*. at 27.

The court affords substantial deference to an agency's interpretation of its own ambiguous regulatory language. *Wyo. Outdoor Council*, 165 F.3d at 52. The court, however, is also required to assess whether an agency, in rendering its decision, "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Md. Pharm., Inc.*, 133 F.3d at 16 (quoting *Motor Veh. Mfrs. Ass'n.*, 463 U.S. 29, 43 (1983)). Although an agency's decision need not "be a model of

analytic precision to survive a challenge," an agency must "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404-05 (D.C. Cir. 1995); *see also Motor Veh. Mfrs. Ass'n.*, 463 U.S. at 43 (observing that an agency's explanation must minimally contain "a rational connection between the facts found and the choice made"). "When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision." *Dickson*, 68 F.3d at 1405. Likewise, a recitation of the facts is insufficient if the agency has omitted the "critical step" of "connecting the facts to the conclusion." *Id.*

As previously discussed, the Affiliated Group Exception provides that hospitals that qualify as members of an "affiliated group" may apply their FTE resident cap limits on an aggregate basis." 42 C.F.R § 413.86(g)(4) (1997). In the preamble to the 1998 Final Rule, the defendant clarified that before hospitals may aggregate their FTE resident caps, they must enter into an agreement "specify[ing] that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount." 63 Fed. Reg. at 26341. The defendant further clarified that past participation by hospitals in a joint training program did not suffice to invoke coverage under the Affiliated Group Exception. *See id.*

In rendering the decision at issue, the PRRB referenced the Affiliated Group Exception, noting that the defendant's 1997 Final Rule "provided for affiliation agreements among parties and the related allocation of FTEs to the members of the affiliated group." A.R. at 17. The PRRB concluded, however, that the plaintiff had not satisfied "any of the various requirements of the Medicare regulations that would have allowed it to include St. Anthony's" FTE resident count in calculating its own FTE resident cap number. *Id.* In determining that the plaintiff had

not qualified under the Affiliated Group Exception, the PRRB noted that although the plaintiff and St. Anthony executed an "affiliation agreement" on March 15, 1991, St. Anthony had withdrawn from the Family Practice Program on June 30, 1996. *Id.* Thus, the PRRB noted that the only affiliation agreement effective as of July 1, 1996 was between the plaintiff and the University of Illinois and that that agreement "ma[de] no allowance for another hospital's residents or caps to be shared." *Id.* After reviewing these "affiliation agreements," the PRRB concluded that the plaintiff's "FTE resident cap should only reflect its 1996 FTE resident count" and that "St. Anthony's 1996 FTE count [had] remain[ed] assigned to [St. Anthony] upon the termination of its relationship with [the plaintiff] and the University on June 30, 1996." *Id.*

The plaintiff asserts that the PRRB acted arbitrarily and capriciously by concluding that the Affiliated Group Exception did not apply based solely on the absence of a written affiliation, without considering the "economic realities" of the relationship between St. Anthony and the plaintiff. Pl.'s Mot. at 32-25; Pl.'s Reply at 14-15. The PRRB, however, specified that it had reviewed the plaintiff's evidence documenting "the history and relationship" between the plaintiff and St. Anthony (including documents of the potential merger). A.R. at 17. At any rate, the PRRB reasonably inferred that pursuant to the preamble to the 1998 Final Rule, the plaintiff was required to have entered into a written affiliation agreement. *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996) (recognizing that a preamble to a rule may have independent legal effect when an agency "inten[ds] to bind either itself or regulated parties" and holding that even "absent an express statement to that effect, [a court] may infer that the agency intended the preamble to be binding if what it requires is sufficiently clear"); *see also Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991) ("[A]n agency's construction of its own regulations is entitled to substantial deference.").

21

Indeed, in light of the fact that the defendant specified in the preamble to the 1998 Final Rule that an affiliation agreement cannot be inferred solely on the basis of a hospital's past efforts to jointly train residents with another hospital, 63 Fed. Reg. at 26341, the PRRB also acted reasonably in rejecting the plaintiff's argument that the previous training partnership between itself and St. Anthony was sufficient to trigger the Affiliated Group Exception. Accordingly, the court concludes that the PRRB did not act arbitrarily or capriciously insofar as it denied the plaintiff relief under the Affiliated Group Exception and grants in part the defendant's cross-motion for summary judgment on this issue. *See Md. Pharm., Inc.,* 133 F.3d at 16 (concluding that the agency's actions were not arbitrary or capricious because the agency had examined the evidence and "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks and citations omitted)).

The PRRB's rejection of the Temporary Cap Increase Exception, however, presents a different matter. Under that exception, a provider who "takes on residents because another hospital closes or discontinues its program" is eligible for a temporary adjustment to its FTE resident cap. 63 Fed. Reg. at 26330; *see also* 42 C.F.R. § 413.86(g)(8) (1999); 42 C.F.R. §§ 413.86(g)(8), 412.105(f)(1)(ix) (2001); 66 Fed. Reg. at 39899-901. Although the PRRB acknowledged that the defendant's regulations provide for a Temporary Cap Increase Exception, *see* A.R. 10-11, the PRRB failed to provide any explanation whatsoever as to why this exception does not apply to the plaintiff's case, *see* A.R. at 17. The PRRB's restatement of the regulatory provisions is insufficient to constitute a reasoned opinion under the APA. *Dickson*, 68 F.3d at 1405; *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (stating that "if the agency has not considered all relevant factors or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare

circumstances, is to remand to the agency for additional investigation or explanation"); *Sprint Nextel Corp., v. Fed. Commc'n. Comm'n.*, 508 F.3d 1129, 1131 (D.C. Cir. 2007) (observing that under the APA, the court "require[s] more than a result; [it] need[s] the agency's reasoning for that result); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 217 F. Supp. 2d 230, 251 (D.D.C. 2003) ("If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making."). Accordingly, the court grants in part the plaintiff's motion for summary judgment and remands this matter to the PRRB so that it may provide further analysis with respect to this issue.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the plaintiff's motion for summary judgment and grants in part and denies in part the defendant's cross-motion for summary judgment. Further, the court remands to the PRRB for the reasons stated herein. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 29th day of March, 2011.

RICARDO M. URBINA
United States District Judge