UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SWEDISH AMERICAN HOSPITAL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 08-2046 (RMU) |
| | : | | |
| v. | : | Re Document No.: | 44 |
| | : | | |
| KATHLEEN SEBELIUS, | : | | |
| Secretary of the Department of | : | | |
| Health and Human Services, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

Denying the Plaintiff's Motion for Reconsideration

**I. INTRODUCTION**

This matter comes before the court on the plaintiff's motion for relief upon reconsideration pursuant to Federal Rule of Civil Procedure 59(e). The plaintiff, a hospital in Rockford, Illinois, seeks review of an administrative ruling made by the Department of Health and Human Services ("HHS") that required the plaintiff to repay several million dollars to the Medicare program for the training of its medical residents. The court granted in part and denied in part the parties' respective motions for summary judgment. The plaintiff now moves for relief upon reconsideration, reasserting its arguments that the administrative ruling violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*. Because the plaintiff has not presented any new evidence or argument that would prompt the court to provide relief upon reconsideration, the court denies the plaintiff's motion.

## II.  BACKGROUND

### A.  Legal Framework

#### 1.  Medicare Reimbursement of Medical Education Costs

Medicare provides health insurance to the elderly and disabled by entitling eligible beneficiaries to have payments made on their behalf for the care and services rendered by health care providers.  *See* 42 U.S.C. §§ 1395 *et seq.*  Providers, in turn, are reimbursed by insurance companies, known as "fiscal intermediaries," who have contracted with the DHS to aid in administering the Medicare program.  *See id.* § 1395h.  Fiscal intermediaries determine the amount of reimbursement due to providers under the Medicare Act and applicable regulations. *See id.*

Providers that train residents in approved residency programs may be reimbursed for the costs of "graduate medical education" ("GME") and "indirect medical education" ("IME").  *See* 42 U.S.C. § 1395ww.  One variable used to calculate the reimbursable GME and IME costs that are allocable to a provider is the number of full-time equivalent ("FTE") residents in that provider's training program.  *See* 42 U.S.C. § 1395ww.  A high GME or IME FTE resident count yields a correspondingly high GME or IME payment for the provider.  *See id.*

To receive reimbursement for these services rendered to Medicare beneficiaries, a provider must submit a yearly "cost report" to its fiscal intermediary, in which it demonstrates the costs incurred during the previous fiscal year and the portion of those costs that is allocable to Medicare.  *See* 42 C.F.R. § 413.20.  The fiscal intermediary may audit the cost report before determining the total amount of reimbursement to which the hospital is entitled; this amount is then memorialized in a Notice of Program Reimbursement ("NPR").  *See id.* § 405.1803.  The

fiscal intermediary may also reopen and revise a cost report within three years after the date of the NPR. *Id.* § 405.1885.

### 2. The FTE Resident Cap

In the Balanced Budget Act of 1997 ("BBA"), Congress capped the number of residents that a hospital may count for purposes of calculating the IME adjustment and GME payments. 42 U.S.C. §§ 139ww(d)(5)(B). More specifically, for cost reporting periods beginning on or after October 1, 1997, the BBA limited the number of GME FTEs and IME FTEs that a hospital could count for the purpose of calculating GME and IME payments to the FTEs in "the hospital's most recent cost reporting period ending on or before December 31, 1996" ("FTE resident cap"). *Id.*

As evidenced by the BBA's legislative history, Congress was concerned with how best to design and calculate the FTE resident cap. H.R. Conf. Rep. No. 105-217, at 821-22 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 176, 441-42. Recognizing the complexity of the issues raised, Congress chose to delegate to the defendant the task of implementing rules to govern the FTE resident cap. *Id*. In delegating this rule-making authority, Congress noted that the defendant should "give special consideration to [new] facilities that meet the needs of underserved rural areas." *Id.* Similarly, Congress instructed the defendant to apply the "proper flexibility to respond to [the] changing needs" of training programs; such flexibility, however, would necessarily be "limited by the conference agreement that the aggregate number of FTE residents should not increase over current levels." *Id*.

The defendant promulgated regulations implementing the FTE resident cap in 1997. *See*

42 C.F.R. §§ 413.86(g)(4), 412.105(f)(1)(iv) (1997) ("1997 Final Rule").  The defendant subsequently revised the regulations concerning the GME and IME resident caps in 1998, 1999 and 2001.  *See* 42 C.F.R. §§ 413.86, 412.105 (1998) ("1998 Final Rule"); 42 C.F.R. §§ 413.86(g)(8) (1999) ("1999 Final Rule"); 42 C.F.R. §§ 413.86(g)(8)(iii), 412.105(f)(1)(ix) (2001) ("2001 Final Rule").  Through these regulations, the defendant carved out exceptions to the FTE resident cap.  One of these regulations, discussed immediately below, is relevant to the court's resolution of the plaintiff's motion.

### 3.  Affiliated Group Exception

Through the BBA, Congress authorized the defendant to "prescribe rules which allow institutions which are members of the same affiliated group (as defined by the [defendant]) to elect to apply the limitation of [the resident cap provision at 42 U.S.C. § 1395ww(h)(4)(F)] on an aggregate basis."  42 U.S.C. §1395ww(h)(4)(H)(ii).  Thereafter, in August 1997, the defendant issued a regulation stating that "[h]ospitals that are part of the same affiliated group may elect to apply the limit on an aggregate basis" ("the Affiliated Group Exception").  42 C.F.R § 413.86(g)(4) (1997) ("1997 Final Rule").  The defendant narrowly defined an "affiliated group" as "two or more hospitals located in the same geographic wage area . . . in which individual residents work at each of the hospitals seeking to be treated as an affiliated group during the course of the approved program."  *Id*.  The regulation did not address whether a written agreement was necessary to demonstrate the existence of an affiliated group.  *See generally id.*

In 1998, the defendant issued revised regulations which provided further guidance regarding the requirements to qualify under the Affiliated Group Exception.  *See* 42 C.F.R. §

4

413.86(b)(2).  More specifically, the 1998 Final Rule expanded the definition of affiliated group to include providers in contiguous areas that were under common ownership.  *Id*.  Additionally, the preamble to the 1998 Final Rule clarified the documentation needed to demonstrate the existence of an affiliated group for cap sharing purposes, stating that

> [h]ospitals that qualify to be members of the same affiliated group for the current residency training year and elect an aggregate cap *must provide an agreement to the fiscal intermediary and the HCFA specifying the planned changes to individual hospital count under an aggregate FTE cap by July 1 for . . . the residency training year.*  Each agreement must be for a minimum of one year and may specify the adjustment to each respective hospital cap under an aggregate cap in the event the agreement terminates, [or] dissolves. . . . [Further,] [e]ach agreement must specify that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount.

63 Fed. Reg. 26318, 26341 (May 12, 1998) (emphasis added); *see also* 42 C.F.R. 413.86(g)(7)(ii) (2002) (incorporating the language used in the preamble of the 1998 Final Rule into the text of the 2002 Final Rule).  Additionally, the defendant stated that "*[h]ospitals that no longer have a relationship for training residents* do not meet the criteria for being members of the same affiliated group even if those hospitals jointly participated in residency training in the past."  63 Fed. Reg. at 26341 (emphasis added).

### B.  Factual & Procedural History

The plaintiff is a teaching hospital and a Medicare provider located in Rockford, Illinois.  Compl. ¶¶ 1, 11.  It trains residents to become family practice physicians through its participation in the Family Practice Residency Program ("the residency program"), a program sponsored by the University of Illinois College of Medicine ("University of Illinois").  *Id*. ¶¶ 12-14.

During fiscal years 1995 and 1996, another hospital, St. Anthony Medical Center ("St. Anthony"), also participated in the residency program. *Id.* ¶¶ 17-18. In 1996, St. Anthony withdrew from the program and the plaintiff absorbed the residents that St. Anthony would otherwise have trained. *Id.*

After the plaintiff took on the residents who had been training at St. Anthony, the plaintiff contacted the fiscal intermediary, Mutual of Omaha ("Mutual"), which advised the plaintiff to adjust its GME and IME FTE resident caps upward to reflect the fact that the plaintiff had assumed the former St. Anthony residents. *Id.* ¶¶ 18-19. As a result, the plaintiff's NPRs for fiscal years 1998 through 2002 were based on FTE resident caps that reflected both the residents trained by the plaintiff and the residents previously trained at St. Anthony. *Id.* ¶¶ 20, 29.

In February 2005, Mutual reopened the cost reports for fiscal years 1999 through 2002[1] and adjusted the plaintiff's FTE resident caps downward to omit consideration of the residents who had previously trained at St. Anthony. *Id.* ¶¶ 21-22. Likewise, Mutual omitted consideration of St. Anthony's residents in the NPR that it issued for fiscal year 2003. *Id.* ¶ 23. After the plaintiff appealed Mutual's determination, the administrative level review board for HHS, the Provider Reimbursement Review Board ("PRRB"), issued a ruling affirming Mutual's adjustments on September 30, 2008. *Id.* ¶ 25. This determination resulted in Medicare recouping nearly $5 million from the plaintiff. *Id.*

The plaintiff commenced this action in November 2008, alleging that the PRRB's

---

[1] Because the NPR for fiscal year 1998 was issued in February 2000, *see* Compl. ¶ 37, the three-year limitation period for reopening a cost report had elapsed by the time Mutual issued the Notices of Reopening in February 2005, *see id.* ¶ 21.

decision violated the APA.[2]  *Id*. ¶¶ 66-87.  In 2010, the court denied the defendant's motion to dismiss, *see* Mem. Op. (Mar. 5, 2010) at 15, and the parties proceeded to file cross-motions for summary judgment.  More specifically, the plaintiff argued that Congress intended for hospitals to share FTE reimbursements in the event that one hospital no longer trained residents.  Mem. Op. (Mar. 29, 2011) at 14-15.  The plaintiff further argued Congress intended for the defendant to be flexible when calculating FTE resident caps at hospitals that assumed residents as a result of hospital closures.  *Id*. at 15.  In March 2011, the court granted in part and denied in part the parties' motions.  *See generally id*.

This matter now returns to the court on the plaintiff's motion for relief upon reconsideration of the court's March 2011 memorandum opinion.  *See generally* Pl.'s Mot. for Recons.  With that motion ripe for adjudication, the court now turns to the applicable legal standards and the parties' arguments.

### III.  ANALYSIS

#### A.  Legal Standard for a Motion for Relief Upon Reconsideration

Federal Rule of Civil Procedure 59(e) provides that a motion to alter or amend a judgment must be filed within twenty-eight days of the entry of the judgment at issue.  FED. R. CIV. P. 59(e).  While the court has considerable discretion in ruling on a Rule 59(e) motion, the reconsideration and amendment of a previous order is an unusual measure.  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (*per curiam*); *McDowell v. Calderon*, 197 F.3d

---

[2]  The plaintiff also asserted tort claims against Mutual and its successor-in-interest, but the court dismissed these claims for lack of jurisdiction in an earlier ruling.  Mem. Op. (Mar. 5, 2010) at 11-12.

1253, 1255 (9th Cir. 1999).  Rule 59(e) motions "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear legal error or prevent manifest injustice." *Ciralsky v. Cent. Intelligence Agency*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone*, 76 F.3d at 1208). Moreover, "[a] Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995), or a vehicle for presenting theories or arguments that could have been advanced earlier, *Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993); *W.C. & A.N. Miller Cos. v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997).

### B.  The Court Denies the Plaintiff's Motion for Relief Upon Reconsideration

The plaintiff first argues that the court should reconsider its prior ruling because the defendant ignored Congress's intent by not aggregating the plaintiff's FTE resident cap.  Pl.'s Mot. for Recons. at 2.  According to the plaintiff, SAH and St. Anthony were affiliates under the defendant's 1997 Final Rule and should therefore have qualified under the "Affiliated Group Exception," allowing SAH to be reimbursed pursuant to a higher aggregate FTE resident cap.[3]

---

[3]   Inexplicably, the plaintiff also argues that St. Anthony was not accredited as a teaching hospital after July 1, 1996 and therefore could not have entered into an affiliation with SAH during the relevant time period.  Pl.'s Mot. for Recons. at 3-4 (stating that because "St. Anthony's took no steps to become an accredited sponsoring institution . . . it could not possibly affiliate with SAH or vice versa").  As the defendant notes, this argument directly undercuts the plaintiff's previous assertions that St. Anthony and SAH were affiliated.  Def.'s Opp'n to Pl.'s Mot. for Recons. ¶ 3. It may be that the plaintiff is – albeit inarticulately – reiterating its argument that SAH's FTE resident cap should have been calculated so as to temporarily include St. Anthony's credits because SAH had taken over St. Anthony's program.  To the extent that this is the plaintiff's argument, the court notes that it has already ruled in the plaintiff's favor with respect to this argument and remanded to the PRRB for further analysis.  *See* Mem. Op. (Mar. 29, 2011) at 22-23.

*Id*.  Additionally, the plaintiff argues that it entered into an agreement with the University of Illinois on May 8, 1996 whereby SAH would assume all financial responsibility for training St. Anthony's residents.  *Id.*

The defendant contends that the plaintiff is simply rebriefing an issue that this court has previously decided.  Def.'s Opp'n to Pl.'s Mot. for Recons. ¶ 2.  Further, the defendant avers that the "[p]laintiff fails to explain – yet again – how St. Anthony and it could be part of an 'affiliated group' to share the resident caps imposed by the BBA of 1997 for its 1999-2003 cost years when St. Anthony was not even training residents as of July 1, 1996."  *Id.*

As discussed at length in the court's previous memorandum opinion, the plaintiff and St. Anthony were not considered affiliates under the defendant's 1997 Final Rule.  *See* Mem. Op. (Mar. 29, 2011) at 16-17 (stating that neither the statute nor the legislative history "demonstrate that Congress intended to allow a teaching hospital to absorb the FTE resident credits from a second hospital solely because the second hospital chose to terminate its participation in a jointly-taught residency program").  The plaintiff's renewed arguments that the defendant ignored congressional intent are essentially variations on its earlier arguments put forth in support of its motion for summary judgment.  Pl.'s Mot. for Summ. J. at 30-31.  Because the plaintiff has already raised this issue before this court, and because the plaintiff cannot reargue previous factual and legal assertions, the court declines to entertain the plaintiff's argument.  *New York*, 880 F. Supp. at 38 (stating that a motion for relief upon reconsideration "cannot merely reargue previous factual and legal assertions").

Next, the plaintiff argues that Rockford, Illinois, the location of SAH, is a rural area, mandating the defendant's "special consideration."  Pl.'s Mot. for Recons. at 8-9.  To support its

9

argument, the plaintiff asserts that there is no "contra evidence in the record that portions of Rockford, Illinois, Winnebago, Boone and Ogle Counties, Illinois were not (and are not) rural areas in 1997." *Id*. at 9. The plaintiff further argues that SAH "participate[d] in a [University of Illinois] Family Practice Rural Tracking Program in rural Ogle County, [Illinois]." *Id.*

On the other hand, the defendant first argues that because the plaintiff did not raise this issue either at the administrative hearings or in a proceeding before the court, it has waived the issue. Def.'s Opp'n to Pl.'s Mot. for Recons. ¶ 4. The defendant further argues that even if the plaintiff has not waived this argument, it must be rejected because 42 C.F.R. § 413.86(g)(6)(iii) applies only to new training programs. *Id*.

Assuming, *arguendo*, that the plaintiff previously raised this argument before the court,[4] the plaintiff nonetheless misconstrues both the facts and the regulations. The defendant may indeed give special consideration to rural hospitals under 42 C.F.R. § 413.86(g)(6)(iii) and adjust the FTE reimbursement cap upwards if a hospital creates "additional new programs *but not [if it] expan[ds] . . . existing or previously existing programs*." 42 C.F.R. § 413.86(g)(6)(iii) (emphasis added). A "new program" is defined as "a new medical residency that receives initial accreditation by the appropriate accrediting body or begins training residents on or after January 1, 1995." 42 C.F.R. § 413.79(l). Here, the plaintiff's program began in the 1970's, *see* Pl.'s

---

[4] The plaintiff has included scattered references – mostly in its opposition to the defendant's motion for summary judgment – to Congress's intent to treat rural hospitals flexibly when calculating FTE resident caps. *See, e.g.*, Pl.'s Reply and Opp'n to Def.'s Mot. for Summ. J. at 6-8 (stating that "[i]n allocating additional FTE residents, the Secretary would be required to give special consideration to facilities that meet the needs of the underserved rural areas"); *see also* Pl.'s Mot. Summ. J. at 6-7 (noting that House conferees were "concerned about the application of the limit on the number of residents to programs established to serve rural underserved areas [and therefore asserted that] the Secretary . . . provide special consideration to such programs . . ." (quoting H.R. Conf. Rep. 105-217 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 176, 442)). The court assumes for the sake of argument that the plaintiff raised this issue.

Mot. for Summ. J. at 1, rendering it an existing program – not a new program – and therefore the defendant was not required to give the plaintiff special consideration as a rural hospital.[5]

Additionally, the relevant question is not whether SAH and the University of Illinois define themselves as a "rural" area, as the plaintiff contends, but whether the regulations define the location of SAH as such. 42 C.F.R. § 412.62(f)(iii). The regulations in place during 1997 define Rockford as part of a "metropolitan statistical area" or an "urban area." *See* 61 Fed. Reg. 46166, 46261 (Aug. 30, 1996) (noting that Rockford, Boone, Ogle, and Winnebago, Illinois are part of the same metropolitan statistical area); 42 C.F.R. § 412.62(f)(ii)-(A) (stating that "[t]he term urban area means . . . [a] Metropolitan Statistical Area"); *see also Heartland Reg'l Med. Ctr. v. Leavitt*, 511 F. Supp. 2d 46, 54 (D.D.C. 2007) *aff'd sub nom. Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) (stating that "this court has already held that the [Metropolitan Statistical Area]-based definition of urban area was not contrary to [the] statutory authority [of the defendant]"). Thus, by definition, Rockford could not have been considered a "rural area" during 1997. 42 C.F.R. § 412.62(f)(iii) (stating that "[t]he term rural area means any area outside an urban area"). Accordingly, the plaintiff fails to present any reason for this court to provide relief upon reconsideration, and the court denies the plaintiff's motion.

---

[5] The court notes that even if SAH's program was new and merited special consideration, the defendant is not required to adjust the plaintiff's FTE reimbursement caps upwards. *See* 42 U.S.C. § 1395ww(h)(4)(H)(i) (stating that "the hospital's unweighted FTE limit *may* be adjusted" (emphasis added)).

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion for relief upon reconsideration.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this _____ day of February, 2012.

RICARDO M. URBINA
United States District Judge
